### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

KRISTIANO LEME,

        Plaintiff,

v.                                         Case No. 3:15-cv-979-J-34PDB

SOUTHERN BAPTIST HOSPITAL
OF FLORIDA, INC.,

        Defendant.

_____/

## ORDER

**THIS CAUSE** is before the Court on Defendant's Motion for Summary Judgment and Memorandum of Law (Doc. 19; Motion), filed on June 1, 2016.  Plaintiff filed a response to the Motion on June 21, 2016, (Doc. 22; Response), and annexed two affidavits, including the Affidavit of Tina Leme (Leme Aff.) as Exhibit A.  Defendant filed an objection to certain portions of Tina Leme's Affidavit on September 20, 2016, <u>see</u> Objection to Portions of Tina Leme's Affidavit Filed by Plaintiff in Response to Defendant's Motion for Summary Judgment, Motion in Limine, and Memorandum of Law in Support (Doc. 25; Objection), and Plaintiff filed a response to the Objection on October 7, 2016, <u>see</u> Plaintiff's Response to Baptist's Challenge of Tina Leme's Affidavit (Doc. 26; Objection Response).  Accordingly, this matter is ripe for review.

## I.   Background[1]

Plaintiff Kristiano Leme (Leme or Plaintiff) brings this case against Southern Baptist Hospital of Florida, Inc. (Baptist or Defendant) alleging disability/handicap, and perceived disability/handicap, discrimination based on his allegedly wrongful termination in violation of the Americans with Disabilities Act (ADA) of 1990 (ADA), 104 Stat. 327, as amended, 42 U.S.C. § 12101 et seq.,[2] and the Florida Civil Rights Act (FCRA), Fla. Stat. § 760.01, et. seq.. See generally Amended Complaint and Demand for Jury Trial (Doc. 2; Complaint).

### A.  Leme's Disability

Leme has a degenerative visual disability known as optic nerve atrophy "that is neither curable nor correctable." See Motion, Ex. A: Deposition of Kristiano Leme (Leme Dep.) at 10-11; Complaint ¶¶ 7, 14.  As of November 18, 2009, Leme had a visual acuity of 20/40 in his right eye and 20/50 in his left eye, which means that with the aid of a corrective lens, Leme could see from 20 feet away what someone with perfect vision could see from 40 or 50 feet away, respectively.  See Leme Dep., Ex. 3: November 18, 2009 Letter from Dr. Alejandro M. Tirado (Nov. 18, 2009 Letter); Motion, Ex. C: Deposition of Paul W. Brazis, M.D. (Brazis Dep.) at 12.  Just four years later, according to a report dated November 27, 2013, his visual acuity dropped to 20/120 in both eyes. See Motion,

---

[1]     The facts recited in this section are either undisputed, or any disagreement has been indicated. Because this case is before the Court on Defendant's Motion, the facts recited herein, and all reasonable inferences therefrom, have been viewed by the Court in a light most favorable to Plaintiff. See T-Mobile S. LLC v. City of Jacksonville, Fla., 564 F. Supp. 2d 1337, 1340 (M.D. Fla. 2008).

[2]     The Americans with Disabilities Act Amendments Act of 2008 (ADAAA), Pub. L. No. 110-325, 122 Stat. 3553 (2008), enacted on September 25, 2008 and effective as of January 1, 2009, significantly changed the definition of "disability" under the ADA.   To the extent that the Eleventh Circuit rendered decisions interpreting the un-amended provisions of the ADA prior to January 1, 2009, those opinions serve as binding precedent.

Ex. B: Deposition of Dr. Katelyn W. Jordan, O.D. (Jordan Dep.) at 16, Ex 2: Brooks Rehabilitation Form, Nov. 27, 2013 (Nov. 27, 2013 Exam).   Leme testified that his disability makes it difficult to see colors, regardless of the degree of contrast.  See Leme Dep. at 246.[3] According to Dr. Katelyn W. Jordan (Dr. Jordan), an optometrist specializing in low vision, Leme met the Social Security Administration's definition of legal blindness. See Jordan Dep. at 18-19.[4]

### B.  Leme's Introduction to Baptist

Leme began his employment with Baptist on November 30, 2009.  See Leme Dep. at 12; Complaint ¶ 6.   Initially, he worked on a part-time basis in the Medical Records Department.  See Leme Dep. at 12.  In February or March 2010, Baptist transferred Leme

---

[3]      Specifically, Leme testified as follows during his deposition:

Q: Okay.  So you do acknowledge that you have difficulty seeing black on white or the reverse?

A: I know that that is what – what has been told in the past by doctors.

Q: Okay.  Well, you'd know whether you can see black on white or the reverse; right?

A: Correct.

Q: Okay.  So are you – you're saying that you just put down what the doctors have said, regardless of what you know you can see?

A: No.  I would – I would say that I do have difficulty with contrast in reading things, yes.

Q: Okay.  With black on white or white on black?

A: It doesn't matter what color.  It could be green on black.

See Leme Dep. at 246.

[4]      Later in her deposition, Dr. Jordan indicated that she "always" gave her patients a visual acuity to meet this definition because it is easier to qualify for "services if that legal blindness number is on there." See Jordan Dep. at 41-42.

to a full-time position in the Central Supply (Materials Distribution) Department as a materials handler.[5] Id. at 29-30, 35.

Through his work in Materials Distribution, Leme built a relationship with Yvonne Carver (Carver), a regular customer and the supervisor and manager of the Anesthesiology Department.[6] Id. at 125; Carver Aff. ¶ 2. In July 2012, Carver mentioned to Leme that the Anesthesiology Department had a vacant anesthesia technician (Tech) position and encouraged him to apply. See Leme Dep. at 125, 152. Although Baptist hired a different candidate to fill that position, Carver informed him of another vacant Tech position in August 2013. Id. at 125-26, Ex. 21: Manage Applicant: Kristiano Leme (Application History). With Carver's encouragement, Leme reviewed the job description that Baptist posted on its website. Id. at 113, Ex. 19: Job Summary. According to the post, Baptist sought an "anesthesia tech for Surgical Services" whose duties would include: "assessing, planning and/or deliver[ing] anesthesia equipment and supplies," "cleaning/car[ing] and stocking of anesthesia carts, supplies and equipment," and most importantly, "assisting the anesthesiologist." See Job Summary. Indeed, a Tech's primary function was to "assist the anesthesiologist in any way necessary with surgical procedures" and provide "an extra set of hands, eyes and ears" so that the anesthesiologist could focus on the patient. See Motion, Ex. M: Affidavit of Clifford Pierce (Pierce Aff.) ¶ 3; Carver Aff. ¶ 2; Leme Dep. at 124, 140. Generally, Baptist assigned

---

[5]    Although technically called the "Central Supply Department," Leme referred to it as the "Materials Distribution" Department throughout his deposition. See Leme Dep. at 47, 54-55, 87, 179-80.

[6]    Shortly after Carver began working at Baptist in 1971, she "developed the position of Anesthesia Technician at Baptist by collaborating with the [a]nesthesiologists to determine the job functions necessary for the Anesthesia Technician to provide the best assistance to enable the [a]nesthesiologists to perform their positions more efficiently, effectively and safely." See Motion, Ex. L: Affidavit of Yvonne Carver (Carver Aff.) ¶ 2; Ex. E: Deposition of Yvonne Carver (Carver Dep.) at 9.

only one Tech to each surgery.  See Motion, Ex. G: Deposition of Clifford Pierce (Pierce Dep.) at 21.

Leme applied for the Tech position, and in September 2013, underwent several rounds of interviews with various supervisors, including Carver and Clifford Pierce (Pierce), the Lead Tech responsible for training all new Techs.  See Leme Dep. at 153; Carver Aff. ¶ 9; Pierce Aff. ¶ 2.  According to Leme, they did not discuss his qualifications, physical abilities, or job duties at the interview; instead, they discussed the reasons Leme applied for the position, training periods, and scheduling issues.  See Leme Dep. at 154. Shortly thereafter, Baptist transferred Leme to the Tech position and restarted his 90 day probationary period.[7]  Id. at 183.

### C.  Leme's Training

Baptist divided Leme's Tech training into two phases.  See Carver Aff. ¶10.  During the initial phase, Steve Parks trained Leme on certain basic functions of a Tech at the Baptist South location.  These basic functions consisted of non-clinical duties that did not involve patient care, including room turnover, restocking carts and medication, bringing blankets to patients, cleaning and preparing the operating rooms between surgical cases, connecting blood-pressure cuffs, and transporting patients to surgery.  See Pierce Dep. at 11-12; Pierce Aff. ¶ 4; Carver Dep. at 11; Leme Dep. at 74, 112-17.  After spending four weeks at Baptist South, Leme began the second phase of his training at the Baptist

---

[7]    Baptist used the first 90 days of a position as a probationary period to assess the new employee's skill level, address any deficiencies, and give the employee an opportunity to improve.  See Motion, Ex. K: Affidavit of Lisa Rosa (Rosa Aff.) ¶3; Ex. H: Deposition of Lisa Rosa (Rosa Dep.) at 49.  At the end of the period, Baptist may terminate the employee or extend the period by 30 days.  See Rosa Dep. at 49.

Downtown location.[8]  See Leme Dep. at 170-73.  There, Pierce attempted to train Leme on the clinical functions involving direct patient care.  Id. at 88, 142-43, 170-71; Pierce Aff. ¶ 2.

Pierce tried to teach Leme how to prepare and assist anesthesiologists with placing an arterial line (A-line)—"a catheter placed in an artery in the patient's wrist that monitors the patient's blood pressure, blood oxygen levels, heart rate, and body temperature in real time during surgery."  See Pierce Aff. ¶¶ 5, 6.  The purpose of A-line preparation is to aseptically clear air bubbles from the line.  Id. at ¶¶ 6, 8.  Failing to clear bubbles from the line "pose[s] a significant risk of harm to the patient," and can cause "a massive embolus leading to stroke or death."  Id. at ¶ 8; Leme Dep. at 166.[9]  According to Pierce, this critical task was an "essential daily function" of the Tech position.  See Pierce Aff. ¶ 5.  Carver agreed that "placing and connecting [A-lines] while using proper aseptic technique to not contaminate the line" was an essential function of the Tech position, based on her "creation of the [Tech] position," "knowledge and supervision of the position," "performance of the duties," and "four decades of working with the [a]nesthesiologists." See Carver Aff. ¶ 5.  According to Dr. Velez, Techs "serve no purpose in the operating room" if they cannot provide "critical assistance with the placement of [A-lines]."  See Motion, Ex. O: Affidavit of Samuel Velez, M.D.(Velez Aff.) ¶ 4.  When Techs

---

[8]  The initial phase of training ordinarily takes one or two weeks.  See Carver Aff. ¶10.  However, Carver extended Leme's initial training because she was on vacation and did not want him to begin the second phase until she returned.  Id.

[9]  According to Tina Leme's testimony, a nurse at Baptist's Heart Center, Baptist "routinely" performed Bubble Studies whereby air bubbles were intentionally injected into a patient's circulatory system in order to evaluate whether the patient's heart had a hole.  See Leme Aff. ¶ 7.  In Tina Leme's experience, "no patients were ever injured by the air bubbles" injected during these studies.  Id. Tina Leme's experience in conducting bubble studies does not address Pierce's undisputed testimony regarding the risks of failing to clear an A-line in preparation for a surgical procedure.

fail to clear all bubbles, the anesthesiologist either has to instruct the Tech or "complete the process" himself.  See Pierce Dep. at 52-53; Response, Ex. B: Affidavit of Lewis Crawford (Crawford Aff.) ¶ 8.  Indeed, Crawford, a former co-worker of Leme, testified that he did not feel comfortable as a Tech until he mastered A-line preparation.  See Motion, Ex D: Deposition of Lewis Page Crawford (Crawford Dep.) at 23.  He described A-line connection as a regular function of the Tech position, and indicated that he prepared "a whole lot" of A-lines.  Id. at 21, 29.  Leme testified that when he began the clinical portion of his training, he did not think A-line preparation would be an essential function of the Tech position based on his training at Baptist South and the Job Summary.  See Leme Dep. at 112-13, 117-18.  He also testified that he had heard of a Tech who did not connect A-lines, although he did not know why.  Id. at 118-19.  Nevertheless, he recognized that his training at Baptist downtown consisted almost entirely of A-line preparation and draining fluid warmers.[10]  Id. at 117-18, 142-43, 164, 172-73.

A-line preparation consists of three stages.  See Crawford Aff. ¶ 7.  First, Techs prepare A-lines outside the operating room, see id., by "setting up and connecting the transducer[11] to the IV line (a thin clear tube approximately four (4) millimeters in diameter) that is connected to an IV bag and pressure bag."  See Pierce Aff. ¶ 6.  The sterile ends and ports of the line have protective caps to protect against contamination.  Id., Ex. 1: Arterial Lines.  Without contaminating the line, the Tech removes a protective cap and flushes the line with clear fluid to eliminate all air, which is "visible as small pockets of air

---

[10]      Fluid warmers are machines that warm fluid prior to inserting the fluid inside of a patient's body.  See Leme Dep. at 162.

[11]      A transducer is "a device that is actuated by power from one system and supplies power usually in another form to a second system."  Med. Definition of Transducer, MERRIAM-WEBSTER.COM, https//www.merriam-webster.com/dictionary/transducer#medicalDictionary (last visited Feb. 9, 2017).

or tiny bubbles in clear fluid in clear tubing." See Pierce Aff. ¶ 6.  As the Tech flushes the line, he "must constantly look through the tubing to make sure that there are no air bubbles." Id.  Once all air is removed, the Tech places the protective cap back on the tip to keep the end sterile and prevent air from re-entering. Id.  The anesthesiologists remain completely sterile during the procedure and rely on the Tech to touch unsterile items, such as the exterior of the cap. Id. at ¶ 12.

In the second stage, the Tech brings the line into the operating room and the anesthesiologist inserts a catheter into an artery in the patient's wrist. Id. at ¶ 7.  The Tech then removes the protective cap, and connects the sterile end of the line to the catheter, usually by using hemostat clamps to twist them into place. Id.  According to Pierce, "[t]his requires good visual acuity and hand-eye coordination to prevent touching a sterile end to a non-sterile surface." Id.  The Tech next places a bandage on the patient's wrist to hold the catheter in place. Id. at ¶ 8.  To ensure air from the catheter does not escape into the A-line, the Tech "aspirate[s] and flush[es] the air from the lines again in a very specific way."[12] Id.  When the air is removed, blood and fluid flow into the syringe.  Id.  According to Crawford, the bubbles are easier to see during this stage because "there is a higher contrast between blood and the clear bubbles." See Crawford Aff. ¶ 7.  Then, the Tech flushes the line "quickly and thoroughly so no air goes into the patient.  Accordingly, the [Tech] must watch the line carefully during this process." Id.  Finally, the Tech flushes the entire line again. Id.

---

[12]     First, the Tech turns a stopcock—"a valve that stops or permits the flow of fluid and air in the line"—backwards.  See Pierce Aff. ¶ 8.  The Tech then removes protective caps from a port next to the stopcock and the syringe, and "twists the syringe to the port." Id.  Next, the Tech aspirates the line by drawing back on the syringe, which draws both air and blood through the catheter, away from the patient, and into the syringe. Id.

Leme admitted that he had trouble connecting A-lines initially.  <u>See</u> Leme Dep. at 142.  For example, when taping an IV line onto a patient's wrist, Leme sprayed the anesthesiologist, Dr. J. Wesley Fleming (Dr. Fleming) with adhesive instead of the patient. <u>See</u> Motion, Ex. P: Affidavit of J. Wesley Fleming (Fleming Aff.) ¶ 5.  Although Leme did not recall having an issue with Dr. Fleming, he did not deny that this incident occurred, <u>see</u> Leme Dep. at 200-01, 211.  On another occasion, Pierce observed Leme attempt to connect the sterile end of an A-line to a catheter, but miss and touch the sterile portion to his non-sterile finger.  <u>See</u> Pierce Dep. at 13-21.  Although Leme testified that Pierce did not tell Leme that "he was concerned about [Leme] not being able to connect [an] A-line without contaminating it," Leme did not deny that this incident occurred, <u>see</u> Leme Dep. at 144-45, and stated that Pierce commented on Leme's vision on a daily basis, <u>id.</u> at 232.

Despite having difficulty connecting A-lines initially, Leme found accommodations that he believed enabled him to prepare the A-lines successfully.  <u>Id.</u> at 142, 144, 146, 165, 204.  Crawford testified that he "worked with [Leme] several times directly, doing A-lines and other procedures," and that he "was satisfied that [Leme] had the ability to perform all necessary duties as a Baptist Anesthesia Technician [sic]."  <u>See</u> Crawford Aff. ¶ 5.  As one accommodation, to improve his ability to see air bubbles in the lines, Leme held the line up to the light.  <u>See</u> Leme Dep. at 165.  In this regard, when asked if he believed he had "any trouble seeing the bubbles," Leme responded, "No. … [T]he bubbles, if you hold the line and look, you can see, given the light catching in a bubble, it is basically a sphere; so when light travels through, there's a contrast between the fluid and the bubble."  <u>Id.</u>  Additionally, in order to connect the A-line to the catheter, Leme felt

the tips. Id. at 145-46. He testified that in order to see where to make the connection, he held the line about two and a half feet from his face. Id. at 204.

Baptist expressed concerns that Leme's accommodations jeopardized patient safety. As to Leme's first accommodation, Baptist provided testimony that once the line was connected to the catheter inside the patient's artery and bandaged to the patient's wrist, Leme could not hold it up, see Pierce Aff. ¶ 8, because "grabbing" at the line and "moving it in and out" of the patients put them at risk of a hematoma[13] and could have required re-starting the process, see Pierce Dep. at 21. Leme did not dispute that holding the line was only feasible during the first stage of A-line preparation, before the line was connected to the patient. See Leme Dep. at 204-05. Leme testified:

> If the cords are long, I could -- prior to connecting the A-line is when you would be checking for the bubbles, so yeah, I could hold the thing closer. I could hold it to the light to see the air bubbles, at which point I would have flushed -- flushed the lines prior to connecting it.

Id. (emphasis supplied). Baptist also expressed concerns that Leme's second accommodation, touching the tips, jeopardized patient safety. Once the protective cap is removed, the sterile connector is exposed and cannot be contaminated. See Pierce Dep. at 20; Leme Dep. at 145-46. Pierce testified that on several occasions, he saw Leme touch sterile portions of the catheter with his non-sterile hands, thereby contaminating the lines. See Pierce Dep. at 13-15; Pierce Aff. ¶¶ 14, 17. Although Leme testified that he "[c]ould see the tips well enough to put them together without contaminating any part of the A-line," id. at 146, he later clarified that in order to see where to connect the A-line and the catheter, he had to hold the line two or two and a half feet from his face, id. at

---

[13] A hematoma "is an abnormal collection of blood outside of a blood vessel." Hematoma, MEDICINENET.COM, http://www.medicinenet.com/hematoma/page2.htm (last visited Feb. 13, 2017).

204.  According to Pierce, contaminating the A-line by touching it with a non-sterile hand put patients at risk of serious infections.  See Pierce Aff. ¶ 14.  While an infection, at times, can be warded off simply by wiping the contaminated tip with two alcohol swipes, see Carver Dep. at 47-48, if the anesthesiologist deems this insufficient, it may be necessary to re-do the entire line or administer medication, see Carver Aff. ¶ 8; Velez Aff. ¶ 5; Fleming Aff. ¶ 5.  Leme proposed that wearing gloves during the A-line connection process could prevent infection.  See Notice of Identification of Reasonable Accommodation (Doc. 18; Notice) at 2.  However, according to Pierce, the gloves would become contaminated when the Tech touched non-sterile objects, such as the protective caps, and it would be impractical to change gloves frequently because in a surgical setting, "time is of the essence."  See Pierce Aff. ¶ 15.  Indeed, for high risk patients, time delays "could be the difference between having a successful surgery and a poor outcome."  See Velez Aff. ¶ 5.  Leme also proposed having the anesthesiologist connect and clear the A-line instead of him.  See Leme Dep. at 216, 227, 290; Notice at 2.

Leme's inability to master A-line preparation to Baptist's satisfaction prevented him from completing the clinical portion of his training.  See Pierce Dep. at 23; 57-58.  Indeed, Leme acknowledged that his training "pretty much" ended after Pierce attempted to teach him how to prepare A-lines.  See Leme Dep. at 172-73.  Although Pierce usually taught new Techs how to setup and connect Central Venus Pressure monitors (CVPs)[14] and Swans[15] after training the Techs on A-line preparation, Pierce did not train Leme on these

---

[14]     CVPs are "catheter[s] placed in an artery in the neck of a patient to monitor central venus pressure" that are usually used in high risk and cardiac patients.  See Pierce Aff. at ¶ 9.

[15]     Swans are catheters placed in an artery in a patient's neck to monitor "heart and lung function, blood flow, and … the effectiveness of medication on the heart."  See Pierce Aff. at ¶ 10.

functions because, according to Pierce, Leme "did not demonstrate enough proficiency with A-line preparation." See Pierce Aff. at ¶ 19.

Throughout Leme's training, Carver received reports that Leme contaminated A-lines, failed to see air bubbles, and frustrated physicians with his inability to move quickly through procedures while maintaining his aseptic technique. See Carver Dep. at 38-41; Pierce Dep. at 57; Pierce Aff. ¶ 17; Fleming Aff. ¶ 6. Carver met with Leme on December 20, 2013 to discuss these reports, id. at 85-90, 174-78; Carver Dep. at 14-17; 40-41, and he assured her that he would see a physician to get a new pair of glasses, see Leme Dep. at 85-86; Carver Dep. at 14-15; 39-40.[16] Although Leme obtained a prescription for surgical loupes in January 2014,[17] see Leme Dep. at 97-100; Ex. 12 (Jan. 23, 2014 Letter), he did not use the loupes in the operating room because the environment was too fast paced to put them on and remove them as needed, see Leme Dep. at 97-99.

Towards the end of Leme's 90 day probationary period, Carver shadowed his performance and testified that she observed numerous errors. See Carver Aff. ¶ 11; Leme Dep. at 188-89, 212-13. She had concerns regarding Leme's inability to read information off the touchscreen computer display monitors, which Leme did not dispute. See Carver Aff. ¶ 11; Leme Dep. at 190, 195, Ex. 24: April 9, 2014 E-mail from Yvonne

---

[16]   Although Leme testified that he did not recall this conversation with Carver, he did not deny that it occurred and further acknowledged that he got a new prescription for glasses after a conversation with Carver. See Leme Dep. at 174-75, 185.

[17]   Surgical loupes are "any of several varieties of magnifying glasses" that are "intended to fit in the eye socket, to be attached to spectacles, or to be held in the hand." Loupe, DICTIONARY.COM, http://www.dictionary.com/browse/loupe (last visited Feb. 9, 2017). Leme's prescription was for surgical loupe spectacles (eyeglasses). See Leme Dep. at 99, Ex. 12: Brooks Rehabilitation, Jan. 23, 2014 Letter (Jan. 23, 2014 Letter).

D. Carver (April 9, 2014 E-mail).[18]   When Counsel asked Leme during his deposition whether Baptist could have done anything that would have enabled him to read the monitors, Leme responded that "other than other individuals in the room reading that particular monitor for the physician or the physician reading the monitor themselves, that's the only thing I can think of."   See Leme Dep. at 190-91.   However, the parties disagree as to whether reading monitors was an essential function of the Tech position.   Leme testified that he received no training on how to read or interpret the monitors, id. at 123, 156, and that he had never been asked to read a monitor before Carver instructed him to do so during the last week of his 90 day probationary period, id. at 158-59, 189.   In accord with Leme's view, Crawford testified that Techs only read machines "as a courtesy," and that in Crawford's five years as a Tech at Baptist, he read the monitors fewer than ten times.   See Crawford Dep. at 40-41; Crawford Aff. ¶ 13.   Further, Dr. Samuel Velez (Dr. Velez), an anesthesiologist at Baptist, testified that anesthesiologists did not usually ask Techs to read the monitors more than once per case because the anesthesiologists "constantly" looked at the monitors themselves.   See Motion, Ex. F: Deposition of Samuel Velez, M.D. (Velez Dep.) at 15.   However, Pierce testified that in emergency situations, it was especially important for a Tech to read the monitor because the anesthesiologist must focus on the patient.   See Pierce Aff. ¶11.   According to Pierce, Techs must be able to read a patient's "blood pressure, heart rate, [and] oxygen level" from the monitor for the anesthesiologist, and know "whether certain waves are present."   Id.

---

[18]      Although Carver testified that she was most concerned by "Leme's attempts to read [the monitor]" and providing "inaccurate information," Leme denied having ever done so.   See Carver Aff. ¶ 11; Leme Dep. at 193-96.   However, whether Leme misread information off the monitor is immaterial to resolution of the Motion, because there is no genuine dispute that Leme could not, in fact, read the monitors.

### D. Leme's Evaluations

In April, Carver and Tyrone Stewart (Stewart), Baptist's Senior Operations Manager for Surgical Services, discussed their concerns regarding Leme's performance with Lisa Rosa (Rosa), Baptist's Human Resources Business Partner.  <u>See</u> Rosa Aff. ¶¶ 2, 4.  On Monday, April 14, 2014, at Rosa's recommendation, Carver and Stewart met with Leme to discuss his performance.  <u>See</u> Leme Dep. at 208-18, 238-39, Ex. 29: Baptist April 14, 2014 Note (April 14, 2014 Note);[19] Carver Dep. at 52-58; Motion, Ex. I: Deposition of Tyrone Jerod Stewart (Stewart Dep.) at 10-24.  At the meeting, Stewart and Carver advised Leme that he must be able to keep the environment sterile, read and operate the monitors, and connect A-lines.  <u>See</u> Leme Dep. at 239, Ex. 31: April 22, 2014 EEOC Intake Questionnaire Fax (EEOC Questionnaire) at 6; April 14, 2014 Note.[20] Following the meeting, Stewart and Carver allowed Leme to continue working as a Tech and scheduled him for another evaluation a week later on Monday, April 21st.  <u>See</u> Carver Dep. at 34; Stewart Dep. at 21.  Carver explained that she gave Leme a week to improve his performance, consider "what his needs were," and perhaps meet with another physician, although she did not expect him to be able to get an appointment with a physician within a week.  <u>See</u> Carver Dep. at 58.  According to Leme, Baptist's characterization of the week as "an opportunity to improve" was a sham because Stewart effectively told him to use the week to "correct" his vision, which would have been impossible.  <u>See</u> Leme Dep. at 209-10.

---

[19]   The parties agree that the correct date of the Note is April 14, 2014, even though it misstates the date as "Monday 14, 2014."  <u>See</u> Leme Dep. at 208; Carver Dep. at 52-53.

[20]   Leme contends that because Carver identified the particular skills Leme needed to improve in the April 14, 2014 Note, but failed to acknowledge that his visual disability caused his deficiencies, Baptist did not have a "good faith" belief that his visual disability hindered his ability to perform his job.  <u>See</u> Response at 9.

Leme continued to work as a Tech after the meeting.  <u>See</u> Carver Dep. at 34-35.  However, just three days later, on Thursday, April 17, Dr. Velez e-mailed Carver to share that Leme's "serious visual limitations" prevented Leme from noticing that an A-line "was full of air bubbles."  <u>See</u> Velez Dep. at 5-8, 21-22, Ex. 1: April 17, 2014 E-mail from Samuel Velez (the Velez E-mail).  In his e-mail, Dr. Velez stated:

> This is where patient safety becomes a huge concern because accidentally flushing air in to the arterial system would lead to a massive embolus leading to a stroke or death.  Although it may seem that anyone could be an anesthesia tech, anyone with serious uncorrectable visual loss should not be considered a reasonable candidate to perform this task.  I will state that this is not a personal vendetta or a bias, is a great concern for patient safety [sic] and the consequences for all parties should a preventable medical errors arise.  [sic].

<u>See</u> the Velez E-mail.  When asked about this in his deposition, Leme recalled an incident in which Dr. Velez grabbed the line from him, but insisted that "[t]here were no air bubbles in the line" and that he was in the middle of the flushing process.  <u>See</u> Leme Dep. at 203.  Although Leme stated that he did not know why Dr. Velez grabbed the line from him he neither disputed that Dr. Velez believed the line had bubbles and presented a danger to the patient, nor that Dr. Velez expressed that concern to Carver in the Velez E-mail.  <u>Id.</u>  Carver immediately forwarded the Velez E-mail to Stewart.  <u>See</u> Carver Dep. at 58.  They scheduled a telephone conference with Rosa and Christine Olinski (Olinski), Senior Consultant for Occupational Health and Leave Administration, to take place before Leme's re-evaluation.  <u>See</u> Rosa Dep. at 14-18; Rosa Aff. ¶ 5; Stewart Dep. at 12-13, 34; Motion, Ex. J: Deposition of Christine Olinski (Olinski Dep.) at 18-19.  Rosa advised Carver and Stewart to address their concerns with Leme at his scheduled evaluation, and afterwards, to arrange a meeting between Leme and Olinski to explore possible

accommodations that would enable him to continue working as a Tech, or other available positions within Baptist.  <u>See</u> Carver Dep. at 63-66; Rosa Dep. at 14-17, 34-39.

As planned, Carver and Stewart met with Leme on Monday, April 21.  <u>See</u> Stewart Dep. Ex. 4: April 21, 2014 Meeting Notes (April 21, 2014 Notes);[21] EEOC Questionnaire. Stewart's April 21, 2014 Notes indicate that Leme admitted that his visual impairment "was much more intricate and noticeable" in the Tech position, <u>see</u> Stewart Dep. at 22-23, 31-33; April 21, 2014 Notes at 2, although Leme did not recall this admission, <u>see</u> Leme Dep. at 220-21.  At the end of the meeting, Carver and Stewart instructed Leme to meet with Olinski "prior to returning to the Anesthesia Department."  <u>See</u> Stewart Dep. at 13; April 21, 2014 Notes; Carver Dep. at 64-65.  However, Leme testified that at this point, he knew Baptist would not have permitted him to continue as a Tech because his vision had not improved since the April 14th meeting, and he did not know of a single accommodation at that time that would have enabled him to fulfill his duties as a Tech.[22] <u>See</u> Leme Dep. at 222-24, 226; Olinski Dep. at 13, 23-24.  Olinski asked Leme to provide her with a note from his physician discussing his visual limitations and any reasonable accommodations.  <u>See</u> Leme Dep. at 224-25; Olinski Dep. at 16-17.  Olinski then brought Leme to Rosa to discuss his potential transfer within Baptist.  <u>See</u> Rosa Aff. ¶ 7.  Rosa advised Leme that he had 30 days to review Baptist's job postings and apply for a transfer. <u>Id.</u>; Leme Dep. at 252-53.

---

[21]     Although the document reflects that the meeting took place on Monday, February 21, 2014, the parties agree that the correct date is April 21, 2014.  <u>See</u> Stewart Dep. at 30; Leme Dep. at 218.

[22]     On May 2, 2016, after the completion of discovery in this action, Leme filed the Notice identifying his proposed reasonable accommodations.  <u>See</u> Notice.

### E.  Leme's April 23, 2014 Removal from the Tech Position

On April 23, 2014, at Rosa and Stewart's instruction, Carver officially removed Leme from his position as a Tech by e-mailing him his 90 Day Probationary Review indicating that he "did not meet requirements to continue employment."[23]   Despite his removal, on May 5, 2014, Leme e-mailed Olinski and Rosa to inform them that he had not applied for a transfer because he did not know whether he qualified for any of the available jobs.  See Leme Dep. at 250-52, Ex. 33: May 5, 2014 E-mail from Kristiano Leme (May 5, 2014 E-mail).  Leme attached a copy of Dr. Jordan's summary of an eye exam she performed on December 6, 2013 to the e-mail.  See Leme Dep., Ex 11: Brooks Rehabilitation December 6, 2013 Patient Summary for Return to Work (Dec. 6, 2013 Summary).  At that time, Dr. Jordan gave Leme a new prescription for distance viewing and recommended that Baptist accommodate Leme by:  (1) permitting him to use a magnifying app on his phone;[24] (2) providing better lighting; (3) providing a "closer working distance" and magnifying the print; and (4) affording him "additional time to read materials."  See Dec. 6, 2013 Summary.  Upon receiving the May 5, 2014 E-mail, Rosa urged Leme to contact her, but they were unable to connect.  See Leme Dep. at 252-55; Rosa Aff. ¶ 9.

---

[23]     Rosa testified that whenever a Probationary Review reflects that an employee cannot not meet their job requirements, the employment is automatically "separated" and the employee is "terminated."  See Rosa Dep. at 47.  The parties dispute whether Leme was still an active employee after he received his Probationary Review.  Baptist contends that Leme was no longer working as a Tech, but was still an active employee for payroll purposes for another 30 days, during which time he could apply for a transfer.  Id. at 48.  Although Leme disputes this contention, see Leme Dep. at 263, the issue of whether Baptist terminated Leme or merely removed him from his Tech position is not material to resolution of the Motion.

[24]     Leme admitted that using his cell phone would have been impractical because the phone was unsterile and he needed both of his hands to connect A-lines.  See Leme Dep. at 144.

On May 13, 2014, Rosa sent Leme a letter confirming that the Anesthesia Department would not be able to accommodate him.  See Leme Dep., Ex. 34: May 13, 2014 Letter from Lisa Rosa (May 13, 2014 Letter); Rosa Aff. ¶ 10; Rosa Dep. at 24-33. She also reminded Leme that his 30 day window to apply for a transfer would expire on May 21, 2014.  See May 13, 2014 Letter.  Rosa advised Leme to contact her to discuss his options.  Id.  In response, Leme scheduled a meeting with Rosa and Olinski for May 22, 2014.  See Leme Dep. at 256; Rosa Dep. at 18-21; Rosa Aff. ¶ 7.  At the meeting, Rosa and Olinski gave Leme an additional 30 days to apply for alternative positions, and suggested that he consider a desk position with patient financial services or patient access services.  See Leme Dep. at 260; Rosa Dep. at 20-21, 57; Rosa Aff. ¶ 7.  However, within hours of the meeting, Leme e-mailed Rosa to inform her that he did not intend to apply for a transfer.  See Leme Dep., Ex. 35: May 22, 2014 E-mail from Krisiano Leme (May 22, 2014 E-mail).  On May 19, 2014, Leme filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC).  See Leme Dep., Ex. 37: Charge of Discrimination.

## II.    Standard of Review

Under Rule 56, Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other

materials." Rule 56(c)(1)(A).[25]   An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant.  See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed.2d 202 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial.  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (citations and quotation marks omitted).  Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the

---

[25]     Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." Id. Thus, case law construing the former Rule 56 standard of review remains viable and applies here.

suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248, 106 S. Ct. at 2510.   In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment."  Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## III.   Preliminary Issue:  Admissibility of Tina Leme's Affidavit

Before addressing the parties' respective positions with regard to the merits of Leme's claims, the Court must resolve Baptist's Objection to the admissibility of certain evidence.  Baptist objects to Tina Leme's testimony in paragraph numbers 7 and 8 of her affidavit, in which she states:

> 7. In my capacity as the RN in the COPs Unit,[26] we routinely performed what are known as Bubble Studies.  To do a bubble study, you intentionally inject air bubbles into a patient's circulatory system so the bubbles can be tracked using an Echocardiogram machine as they travel through the heart to assess whether the patient has a hole in their heart. I personally injected these bubbles several times a week.  I continue to perform Bubble Studies occasionally and did so last week.  When we do this, we are looking for bubbles that transfer improperly through a hole in the heart.  In my experience, no patients were ever injured by the air bubbles that we injected in performing the studies.

> 8. In my experience, the size and quantity of the bubbles we routinely inject into patients for bubble studies exceeds the amount that might be inadvertently left in the A-line by poor line clearing technique.

---

[26]    The COPS Unit refers to the Cardiac Outpatient Suites Unit in Baptist's Heart Center.  See Leme Aff. ¶ 4.

Leme Aff. ¶¶ 7-8.  Baptist moves the Court to exclude this testimony because Plaintiff failed to list Tina Leme on his Rule 26 Expert Witness Disclosure, and even if he had, Baptist contends that Tina Leme is not a qualified expert.  See Objection at 2-3.[27]

Generally, courts may not consider evidence for purposes of summary judgment that would not be admissible at trial.  See Corwin v. Walt Disney Co., 475 F.3d 1239, 1249 (11th Cir. 2007) (excluding expert testimony because "[e]vidence inadmissible at trial cannot be used to avoid summary judgment.").  Therefore, the Court will apply the same standards it would use at trial to determine the admissibility of Tina Leme's testimony.  To do so, the Court must determine whether Tina Leme's proffered testimony is expert testimony or lay witness testimony.  If the Court finds it to be expert testimony, the Court will consider whether Leme has laid a proper foundation for its admission.

Leme cites United States v. 0.161 Acres of Land, 837 F.2d 1036 (11th Cir. 1988) for the proposition that a court should not keep relevant evidence from the jury because it "is entitled to accept or reject" an expert's opinion.  See Objection Response at 6.  However, 0.161 is inapt because the Eleventh Circuit addressed whether a district court properly excluded evidence as unduly prejudicial under Rule 403 of the Federal Rules of Evidence.  To resolve the parties' dispute over the admissibility of portions of Tina Leme's Affidavit, the Court need only to determine (1) whether Tina Leme's Affidavit contains expert testimony, and if so, (2) whether she is a qualified expert.  Therefore, 0.161's analysis of Rule 403 is not applicable.

---

[27]   Defendant properly filed an Objection, rather than a motion to strike.  See Campbell, 546 F. App'x at 879 (finding that Rule 56(c)(2) requires parties to file objections "to the admissibility of evidence supporting a summary judgment, … rather than … separate motion[s] to be handled preliminarily."); see also Taylor v. City of Gadsden, 958 F. Supp. 2d 1287, 1291 (N.D. Ala. 2013) (treating a motion to strike evidence submitted in support of a motion for summary judgment as an objection), aff'd, 767 F.3d 1124 (11th Cir. 2014).

### A. Expert v. Lay Testimony

Rule 701 of the Federal Rules of Evidence permits a lay witness to offer opinions or inferences that are "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Although a lay witness may not draw inferences, she can testify as to her observations even if the subject matter is technical. See Zamboni v. R.J. Reynolds Tobacco Co., No. 3:09-cv-11957 (SAS), 2015 WL 221150, at *2 (M.D. Fla. Jan. 13, 2015); see also United States v. Henderson, 409 F.3d 1293, 1300 (11th Cir. 2005) (allowing a physician to provide lay testimony "based on his experience as a physician."). Expert witnesses, on the other hand, testify based on scientific, technical, and specialized knowledge. See FED. R. EVID. 702. They also differ from lay witnesses because of their "ability to answer hypothetical questions." Henderson, 409 F.3d at 1300 (permitting a lay witness to diagnose an injury, but not to speculate on its cause.).

Baptist avers that the testimony in paragraphs 7 and 8 of Tina Leme's Affidavit constitutes expert testimony because Tina Leme uses "scientific, technical, or specialized knowledge" to speculate that patients are unlikely to suffer harm from an uncleared A-line because none were harmed during her bubble studies. See Objection at 6. However, Baptist conflates Tina Leme's testimony with an argument raised in the briefing. In the Response, Leme relies on Tina Leme's testimony to argue that Baptist "substantially overstated any danger" with bubbles in an A-line. See Response at 16. The testimony in Paragraph 7 of Tina Leme's Affidavit, without Leme's inference, does not contain expert testimony. Although Tina Leme testifies about bubble studies, which are of a technical

nature, her testimony is limited to her observations and experiences as a nurse performing bubble studies.  As such, Tina Leme as a lay person can properly testify to these matters assuming they are relevant.

The testimony in Paragraph 8 of Tina Leme's Affidavit, on the other hand, differs. There, Tina Leme hypothesizes that the "size and quantity" of bubbles used in bubble studies "exceeds the amount" one might fail to clear in an A-line.  Nothing in her Affidavit suggests that this testimony is based on her personal knowledge.  Instead it presents her theory or opinion about the danger presented by a failure to clear an A-line.  As such it constitutes expert testimony governed by Rule 702 of the Federal Rules of Evidence.

## B. Expert Foundation

The Court notes that regardless of whether Leme laid a proper foundation for the expert testimony contained in paragraph 8 or not, he is precluded from presenting it in opposition to the Motion due to his failure to disclose Tina Leme as an expert on his Rule 26 Expert Witness Disclosure.  <u>See</u> Objection at 3 n.3.  Under Rule 26(a)(2)(A), "a party must disclose … the identity of any [expert] witness it may use at trial to present evidence …."  The failure to comply precludes use of that information or witness "to supply evidence on a motion."  Rule 37(c)(1); <u>see</u> <u>Reese v. Herbert</u>, 527 F.3d 1253, 1264-66 (11th Cir. 2008) (affirming the exclusion of an expert affidavit because the expert had not been identified pursuant to Rule 26); <u>W. Union Holdings v. E. Union, Inc.</u>, 316 F. App'x 850, 854 (11th Cir. 2008) (same);[28] <u>Cooper v. S. Co.</u>, 390 F.3d 695, 728 (11th Cir. 2004),

---

[28]     "Although an unpublished opinion is not binding . . ., it is persuasive authority." <u>United States v. Futrell</u>, 209 F.3d 1286, 1289 (11th Cir. 2000) (per curiam); <u>see generally</u> FED. R. APP. P. 32.1; 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

overruled on other grounds, Ash v. Tyson Foods, Inc., 546 U.S. 454, 126 S. Ct. 1195, 163 L. Ed.2d 1053  (2006) (same).  Therefore, Leme's failure to disclose Tina Leme as an expert bars the admission of any expert opinions contained in paragraph number 8.[29]

Even if Leme properly disclosed Tina Leme, the opinions in paragraph 8 would still be inadmissible because Leme has not laid a proper foundation for its admission.  "[T]he burden of laying the proper foundation for the admission of expert testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence."  McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1256 (11th Cir. 2002) (citation omitted); see also Rule 56(c)(2), advisory committee's notes.  In order to lay a foundation for expert testimony, the proponent must comply with Rule 702 of the Federal Rules of Evidence, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of opinion or otherwise, if the testimony is based on sufficient facts or data; the testimony is the product of reliable principles and methods; and the witness has applied the principles and methods reliably to the facts of the case.

The Supreme Court has explained that this imposes an obligation on a trial court to act as gatekeeper, to ensure that any and all expert testimony is not only relevant, but reliable.  Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589, 113 S. Ct. 2786, 125 L. Ed.2d 469 (1993).  To fulfill this duty, a trial court must consider (1) if the expert is qualified on the matter she will address, (2) the reliability of her methodology, and (3)

---

[29]     The Court excludes the Declaration of Dr. Majdi Ashchi (Aschi Dec.) annexed to Baptist's Opposition for the same reason – that is, because Baptist failed to disclose Dr. Aschi on its Rule 26 Disclosures.  See Objection Response at 5 n.1.

whether her testimony would be helpful to the trier of fact.  See United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004).

First, Leme failed to show that Tina Leme is qualified to compare bubble studies to clearing an A-line.  An expert "relying solely or primarily on experience" shows she is qualified by explaining how her "experience leads to the conclusion reached, why that experience is a sufficient basis for [her] opinion, and how that experience is reliably applied to the facts."  FED. R. EVID. 702 advisory committee's note.  Tina Leme's cursory description of her training, list of certificates, and experience performing bubble studies says nothing about her experience with A-lines.[30]  Although Tina Leme has "cared for patients" with A-lines and has had "training on clearing bubbles … from arterial lines," she does not purport to have actual experience clearing A-lines.  Tina Leme Aff. ¶ 6.  It is unclear if her training consisted of her merely observing a Tech, and whether she cleared A-lines in fulfilling her duties as a nurse.  As such, Plaintiff has failed to show that Tina Leme's experience qualifies her to express the proffered opinion.

Plaintiff has also failed to provide any evidence regarding Tina Leme's methodology for her comparison.  The Court cannot determine (1) whether the theory or technique can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; or (4) whether the theory has attained general acceptance in the relevant scientific community.  See Daubert, 509 U.S. at 593-94, 113 S. Ct. at 2796-97.  Finally, the Court does not find Tina Leme's testimony helpful to the trier of fact in understanding the evidence or

---

[30]   Tina Leme testified that she is a Registered Nurse employed by Baptist since 1994, trained in Critical Care and Advanced Cardiac Life Support, certified in various areas, and currently works in the Heart Center.  See Leme Aff. ¶¶ 2-5.

determining a fact in issue.  Id. at 591.  Expert testimony is not helpful "where a large analytical leap must be made between the facts and the opinion." McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004) (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 138-39, 118 S. Ct. 512, 139 L. Ed.2d 508 (1997), which found too great an analytical gap between data suggesting that one type of cancer was caused in mice and the conclusion or opinion that such data established causation of another type of cancer in humans). There is too great an analytical gap between Tina Leme's observations of bubble studies and her opinion regarding the danger presented to surgical patients by bubbles that might remain in an improperly cleared A-line.

Accordingly, the Court excludes the testimony proffered in paragraph 8 of Tina Leme's affidavit because Plaintiff neither disclosed Tina Leme as an Expert on his Rule 26 Expert Disclosure nor laid a proper foundation for her testimony.

## IV.    Discussion

"The ADA prohibits discrimination by an employer 'against a qualified individual on the basis of disability in regard to … discharge of employees' and any of the 'terms, conditions and privileges of employment.'"[31] Jordan v. City of Union City, Ga., 646 F. App'x 736, 739 (11th Cir. 2016), aff'g, 94 F. Supp. 3d 1328 (N.D. Ga. 2015) (citing 42 U.S.C. § 12112(a)).  In order to proceed under the ADA, the plaintiff must show that:  (1) he had a disability; (2) he was a qualified individual; (3) the defendant took an adverse employment action against him; and (4) the defendant "took that action because of" the

---

[31]    In addition to his claim under 42 U.S.C. § 12112(a), Leme asserts a claim under the FCRA for handicap discrimination based on an unlawful discharge.  See Complaint, Counts I and II.  Because such FCRA claims are analyzed using the same framework as disability discrimination claims under the ADA, the Court will consider the ADA and the FCRA claims together.  See Holly v. Clairson Indus., L.L.C., 492 F.3d 1247, 1255 (11th Cir. 2007).

plaintiff's disability.[32]  <u>See</u> Eleventh Circuit Civil Pattern Jury Instructions, Instruction No. 4.11 (2013); <u>see also</u> <u>Collado v. United Parcel Serv., Co.</u>, 419 F.3d 1143, 1152 n.5 (11th Cir. 2005).  Before addressing the merits of the Motion, the Court must address the parties conflicting positions regarding their respective burdens of proof on these elements.

The parties' disagreement revolves around the role of direct evidence.  Baptist moves for summary judgment arguing that Leme cannot establish all four elements of his claim because he is not a "qualified individual," and therefore not covered under the ADA. <u>See</u> Motion at 1.  In Response, Leme contends that Baptist's argument is inapposite because he presented direct evidence of discrimination, which precludes summary judgment in Baptist's favor.  <u>See</u> Response at 8.  Baptist did not seek leave to reply to Leme's assertion.  On review of the record, the Court finds that it need not determine whether Leme has presented direct evidence to resolve the Motion.  Summary judgment is due to be granted because Leme has failed to establish that he is a qualified individual, regardless of the presence or absence of direct evidence.

Direct evidence plays a circumscribed role in an ADA discrimination case.  By definition, "[d]irect evidence is that which shows an employer's discriminatory intent 'without any inference or presumption." <u>Hinson v. Clinch Cnty., Ga. Bd. of Educ.</u>, 231 F.3d 821, 827 (11th Cir. 2000) (citation omitted); <u>see also</u> <u>Roberts v. Design & Mfg.</u>

---

[32]     The elements of a <u>prima facie</u> claim under the ADA vary depending on the plaintiff's theory of the case.  <u>See</u> <u>Rylee v. Chapman</u>, 316 F. App'x 901, 906 (11th Cir. 2009) ("A plaintiff can proceed on theories of intentional discrimination, disparate treatment, or failure to make reasonable accommodations.").  As Baptist contends in the Motion, <u>see</u> Motion at 13-14, Leme is precluded from proceeding on a failure to accommodate theory because he failed to plead it.  <u>See</u> <u>Gilliard v. Georgia Dep't of Corr.</u>, 500 F. App'x 860, 870 (11th Cir. 2012) ("With regard to her failure-to-accommodate claims, [the plaintiff] did not include her request to wear sneakers in her amended complaint, and the magistrate judge properly did not consider that claim.").  Although Leme does not explicitly identify his theory, his allegations track those of a disparate treatment claim.  <u>See</u> Eleventh Circuit Civil Pattern Jury Instructions, Instruction No. 4.11 (2013).

Servs., Inc., 167 F. App'x 82, 84-85 (11th Cir. 2006) ("'Direct evidence' of age or disability-based discrimination is 'evidence, which if believed, proves [the] existence of [a] fact in issue without inference or presumption. … Evidence that only suggests discrimination, … or that is subject to more than one interpretation, … does not constitute direct evidence.'") (quoting Merritt v. Dillard Paper Co., 120 F.3d 1181, 1189 (11th Cir. 1997)); Burrell v. Bd. of Trustees of Ga. Military Coll., 125 F.3d 1390 (11th Cir. 1997).  Accordingly, direct evidence is relevant solely to a plaintiff's ability to satisfy the fourth element of his claim—that the defendant took the adverse employment action with discriminatory intent.  Under what the Eleventh Circuit has referred to as the "traditional framework" of establishing a claim of discrimination, "[t]he plaintiff had the burden of presenting evidence from which the trier of fact could conclude, more probably than not, that the defendant-employer took an adverse employment action against the plaintiff on the basis of a protected personal characteristic."  Wright v. Southland Corp., 187 F.3d 1287, 1289 (11th Cir. 1999).  With direct evidence, the plaintiff could easily meet this burden.  However, "[t]he nature of discrimination suits … rendered the traditional framework inadequate to effect fully Congress' intent to eliminate workplace discrimination" because "[a] discrimination suit (unlike, for instance, an action for negligence or breach of contract) puts the plaintiff in the difficult position of having to prove the state of mind of the person making the employment decision."  Id.  Accordingly, "[t]o make matters somewhat easier for plaintiffs in employment discrimination suits" who lacked direct evidence, "the Supreme Court, in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L. Ed.2d 668 (1973), developed a presumption that supplemented-but did not replace-the traditional framework."  Wright, 187 F.3d at 1289 (emphasis supplied).  Under the McDonnell

<u>Douglas</u> presumption, the plaintiff "initially does not need to present evidence from which the trier of fact could conclude that the adverse employment action taken against him was caused by improper discrimination.  Instead, he need only establish that" (1) he was disabled; (2) he was a qualified individual; and (3) "an adverse employment action was taken against him." <u>Id.</u>  "Once the plaintiff has established these elements ... unlawful discrimination is presumed," and "[t]he defendant-employer can rebut this presumption only by articulating a legitimate, nondiscriminatory reason (or reasons) for the adverse employment action." <u>Id.</u> at 1291.  If the employer does not satisfy this burden of production, then the plaintiff is entitled to judgment as a matter of law. <u>Id.</u>  "If, however, the employer carries its burden, … the case is placed back into the traditional framework" and "the plaintiff still bears the burden of proving, more probably than not, that the employer took an adverse employment action against him on the basis of a protected characteristic" and that the employer's proffered reasons are merely pretextual. <u>Id.</u>

Significantly, "the elements needed to establish the <u>McDonnell Douglas</u> presumption, standing alone, are not sufficient to prove that the plaintiff, more probably than not, was a victim of illegal discrimination." <u>Id.</u> at 1292.  As explained by the Eleventh Circuit:

> This point has been the source of some confusion, because the quantum of evidence needed to create a jury question under the traditional framework and the establishment of the facts required to establish the <u>McDonnell Douglas</u> presumption are both known as the '<u>prima-facie</u> case.' The phrase '<u>prima-facie</u> case,' however, has a meaning under the traditional framework very different from its meaning under <u>McDonnell Douglas</u>—in the former case, it means a case strong enough to go to a jury, in the latter case it means the establishment of a rebuttable presumption.

Id.  That is, while traditionally, the term "prima facie case" "refers to the 'quantum of evidence needed to create a jury question' or 'a case strong enough to go to a jury,'" in the McDonnell Douglas context, it "relates to a step in the analytical framework and means the 'establishment of facts required to establish the McDonnell Douglas presumption.'" Collado, 419 F.3d at 1153 n.7 (citations omitted).

Parties facing ADA discrimination claims often find this confusing because the prima facie claim for McDonnell Douglas purposes consists of the same elements as the prima facie claim in the traditional context.  Id. at 1153.  Nonetheless, regardless of whether a plaintiff presents direct evidence or relies on the McDonnell Douglas presumption to establish the fourth element of his ADA discrimination claim—that is, the employer's discriminatory intent—the plaintiff "always has the burden of demonstrating that, more probably than not, the employer took an adverse employment action against him on the basis of a protected characteristic." Wright, 187 F.3d at 1292.  Indeed, the McDonnell Douglas presumption "is merely an evidence-producing mechanism that can aid," but not completely relieve, "the plaintiff in his ultimate task of proving illegal discrimination by a preponderance of the evidence." Id.  It is settled that anytime a plaintiff fails to present "sufficient evidence for a jury reasonably to have found" that all elements of the ADA claim are established, judgment as a matter of law for the defendant is proper. Collado, 419 F.3d at 1154.

An example of such a case is found in Galloway v. Aletheia House, 509 F. App'x 912 (11th Cir. 2013).  There, the Eleventh Circuit affirmed a district court's order granting summary judgment to an employer, despite the plaintiff's purported presentation of direct evidence.  Id. at 913.  In doing so, the court noted that even "[a]ssuming arguendo that

[the plaintiff] presented direct evidence of discrimination, he nonetheless failed to present evidence to establish an essential element of his case: that he was a qualified individual under the ADA." Id. at 913-14.  According to the court, "[s]ummary judgment should be entered against a party who fails to make a showing sufficient to establish the existence of an essential element of its case, and on which it bears the burden of proof at trial." Id. at 913.  Similarly, in Tetteh v. Waff Television, 638 F. App'x 986, 988-89 (11th Cir. 2016), aff'g, No. 5:11-cv-00825-MGG, 2015 WL 1419043 (N.D. Ala. Mar. 27, 2015), the Eleventh Circuit affirmed a district court's order that expressly declined to determine whether the plaintiff had presented direct evidence because the plaintiff failed to establish that she was qualified.  See Tetteh, 2015 WL 1419043 at *7 n.8.  Because of this deficiency, summary judgment in favor of the employer was proper.  See Tetteh, 638 F. App'x at 988-89.  Likewise, in Jordan, 646 F. App'x at 741, the Eleventh Circuit affirmed a district court's order granting summary judgment to an employer due to the plaintiff's failure to establish that he was a qualified individual, despite the presence of direct evidence.  Jordan, 94 F. Supp. at 1343.

       In the instant action, Leme's claim suffers from the same fatal deficiency as those in Galloway, Jordan, and Tetteh—he has failed to establish a genuine issue of fact as to the question of whether he is a qualified individual under the ADA, an essential element of his claim.  Even if Leme has produced direct evidence of Baptist's discriminatory motive, his failure to establish that he is a qualified individual, or "covered" under the ADA, prohibits him from proceeding with his claim.  See Davis v. Fla. Power & Light Co., 205 F.3d 1301, 1305 (11th Cir. 2000).  Accordingly, the Court need not determine whether Leme has presented direct evidence because, as will be discussed below, Leme has

failed to establish all of the elements of his claim, and therefore, summary judgment is due to be granted in favor of Baptist.

### A. Disability

In order to establish the first element of his prima facie case, Leme must prove that he is disabled under the ADA.  Holly, 492 F.3d at 1255-56.  A disability is defined as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(1).  The parties agree that Leme is disabled under subsection (A) because he has optic nerve atrophy—a physical impairment that substantially limits his ability to see, which is a major life activity under the ADA.  See 42 U.S.C. § 12102(2)(A); see also Motion at 2; Response at 1.

This would normally end the Court's inquiry as to whether Plaintiff satisfied the first element of his prima facie case.  However, in his Complaint, Leme also alleges that he meets definition (C) because Baptist terminated him due to his "perceived" disability.  See Complaint, Counts II and IV.  Baptist argues that Leme is precluded from claiming he was discharged due to a "perceived" disability because the parties agree that he is "actually" disabled.  See Motion at 12 n.15.  It is unclear whether Baptist is arguing (a) that Leme may only establish ADA coverage under one subsection, or (b) that a claim for wrongful discharge based on a "perceived" disability fails as a matter of law if the employer's perception is correct.  Nevertheless, the Court need not determine whether Leme may proceed with his perceived disability claim because, regardless of whether he is actually

disabled or perceived to be disabled, to prevail on his ADA claim, Leme must demonstrate that he is a qualified individual under the ADA.[33]

### B. Qualified Individual

In order to establish the second element of an ADA discrimination claim, a "plaintiff bears the burden of proving that [he] is a 'qualified individual with a disability'—that is, a person 'who, with or without reasonable accommodation, can perform the essential functions' of [his] job" without jeopardizing patient safety.  Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806, 119 S. Ct. 1597, 1603, 143 L. Ed.2d 966 (1999) (quoting 42 U.S.C. § 12111(8)).[34]  To prevail under his "actual disability" theory, Leme must show that

---

[33]     "Similar to the framework for evaluating a claim based on an actual disability, to succeed on a perceived disability claim, a plaintiff must show that (1) the employer regarded h[im] as having a disability; (2) that [ ]he was "qualified"; and (3) [ ]he was discriminated against because of h[is] perceived disability." Bagwell v. Morgan Cnty. Comm'n, No. 15-15274, 2017 WL 192694, at *4 (11th Cir. Jan. 18, 2017); see also Wetherbee v. S. Co., 423 F. App'x 933, 934 (11th Cir. 2011); Carruthers v. BSA Adver., Inc., 357 F.3d 1213, 1215 (11th Cir. 2004); Williams v. Motorola, Inc., 303 F.3d 1284, 1290 (11th Cir. 2002).

[34]     Baptist argues that Leme is not a qualified individual under the ADA because he could not perform the essential functions of the Tech position without jeopardizing patient safety.  See Motion at 16-18.  In the Eleventh Circuit, regardless of whether we construe this as an affirmative defense or an argument that Leme has failed to make out a prima facie claim, the employee bears the burden of proving that he does not pose a direct threat in order to establish that he is a qualified individual.  See Waddell v. Valley Forge Dental Assocs., Inc., 276 F.3d 1275, 1280 (11th Cir. 2001) ("[Plaintiff] carries the burden of establishing that 'he was not a direct threat or that reasonable accommodations were available.'") (quoting LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 834-35 (11th Cir. 1998) (affirming a finding that an employee "was not a qualified individual because he could not perform the essential functions of the job without threat of harm to himself or others.")); see also Moses v. Am. Nonwovens, Inc., 97 F.3d 446, 447 (11th Cir. 1996) ("The employee retains at all times the burden of persuading the jury either that he was not a direct threat or that reasonable accommodations were available.").  In Lowe v. Ala. Power Co., 244 F.3d 1305, 1308 n.1 (11th Cir. 2001), the Eleventh Circuit declined to "revisit the issue of where the burden of proof should rest regarding whether the employee poses a direct threat."  However, the court affirmed that the plaintiff bears the burden of proving that he is not a direct threat in order to establish that he is a qualified individual in Waddell, decided after Lowe.  Also, in Roe v. City of Atlanta, 456 F. App'x 820 (11th Cir. 2012), the Eleventh Circuit seemed to approve of this scheme.  It reversed and remanded a district order granting summary judgment in favor of an employer because, in part, the employee could not prove that he did not pose a direct threat.  Id. at 821-22.  The court found that the district court did not give adequate evidentiary consideration to a particular admission, but did not quarrel with the district court's procedure.  Id. Additionally, the District Court for the Northern District Alabama used this scheme in Lewis v. U.S. Steel Corp. Fairfield Works, No. 2:14-cv-01965-AKK, 2016 WL 7373733 (N.D. Ala. Dec. 20, 2016), appeal filed, No. 17-10281 (11th Cir. Oct. 14, 2014).  The court stated:

> Whether an employee poses a 'direct threat' impacts whether the employee was 'otherwise qualified.'  … In analyzing whether an individual poses a direct threat to

he could perform the essential functions of his job either with or without a reasonable accommodation.  Id.  However, to prevail under a "regarded as" theory, he must show that he could perform the essential functions of his job without reasonable accommodation because employers are not required to accommodate individuals "regarded as" disabled.  29 C.F.R. § 1630.2(o)(4).  "Determining whether an individual is 'qualified' for a job is a two-step process."  Reed v. Heil Co., 206 F.3d 1055, 1062 (11th Cir. 2000).  First, the Court considers whether the plaintiff satisfies the position's prerequisites, including "sufficient experience and skills, an adequate educational background, or the appropriate licenses for the job."  Id.  Then, the Court analyzes whether the individual can perform the essential functions of the job.  Id.  Only the second inquiry is at issue here.

As a preliminary matter, the Court must determine what the essential functions of Leme's position as a Tech were.  "[E]ssential functions 'are the fundamental job duties of a position that an individual with a disability is actually required to perform,'" as distinct from mere marginal functions.  Holly, 492 F.3d at 1257 (citations omitted).  The parties agree that a Tech's essential functions included the basic non-clinical functions of "room turnover, restocking, [and] bringing blankets to patients."  See Pierce Aff. ¶ 4; Carver Dep. at 9-10; Leme Dep. at 114-17, 122-23.  Likewise, there is no genuine dispute of material fact as to whether clearing and connecting A-lines was an essential function of the Tech position.  Baptist has presented substantial undisputed evidence to this effect.  For

---

himself, or others, contrary to [plaintiff]'s assertions, in the Eleventh Circuit, the employee 'carries the burden of establishing that 'he was not a direct threat or that reasonable accommodations were available.''

Id. at *3 (citations omitted).

instance, Carver testified that "placing and connecting [A-lines] while using proper aseptic technique to not contaminate the line" was an essential function of the Tech position, based on her "creation of the [Tech] position," "knowledge and supervision of the position," "performance of the duties," and "four decades of working with the [a]nesthesiologists." See Carver Aff. ¶ 5.  Further, Dr. Velez testified that Techs "serve no purpose in the operating room" if they cannot provide "critical assistance with the placement of [A-lines]." See Velez Aff. ¶ 4.  Leme has not disputed Baptist's view that A-line preparation was an essential function of the tech position.  In fact, Leme seems to have conceded this point through Counsel in the Response.  See Response at 13.  There, in support of Leme's argument that he was able to perform all essential functions of the Tech Position, Counsel discusses Leme's ability to prepare A-lines.  Id.  Although Leme testified that when he began the clinical portion of his training, he did not think A-line preparation would be an essential function of the Tech position based on his training at Baptist South and the Job Summary, see Leme Dep. at 117-18, Leme's belief about what his essential duties "would be" is insufficient to create a genuine issue of material fact in the face as the undisputed evidence as to what his essential duties actually were.  In fact, later in his deposition, Leme brought up the A-line connection process during a discussion about the essential functions of his position.  See Leme Dep. at 226-27, 290.  Specifically, when asked why it was inappropriate to remove Leme from the Tech position, considering that he could not perform the job, Leme responded that accommodations could have been made, such as having the physician connect the A-lines.  Id. at 226-27.   When asked again how he would be able to perform the Tech position, Leme responded that he would do so by having the physician connect the A-lines for him.  Id. at 290.

Additionally, Leme's general assertion that he heard of a Tech at Baptist who did not connect A-lines, does not give rise to a genuine issue of material fact regarding whether A-line preparation was an essential function of the Tech position.  First, because Leme does not have personal knowledge of this Tech's duties and presents this testimony for the truth of the matter asserted, it constitutes inadmissible hearsay.  See FED. R. EVID. 801-02.  As discussed, courts may not consider evidence for purposes of summary judgment that would not be admissible at trial.  See Corwin, 475 F.3d at 1249; see also Macuba v. Deboer, 193 F.3d 1316, 1323-24 n.18 (11th Cir. 1999) (noting that generally, "inadmissible hearsay 'cannot be considered on a motion for summary judgment,' and that a district court may "consider[ ] only those portions of a submitted deposition 'which appear to be based on … personal knowledge.'") (citation omitted).  Additionally, even if the testimony were admissible, without any context, the statement does not "approach the required specificity" to create a genuine dispute.  See Liberty Leasing Co. v. Hillsum Sales Corp., 380 F.2d 1013, 1015 (5th Cir. 1967) (holding that because detailed and precise facts are necessary to combat a motion for summary judgment, "the deposition relied upon … to show that summary judgment should not have been granted, contains no statement that in any way approaches the required specificity.").[35]  At most, Leme's general assertion regarding this unidentified Tech constitutes "a mere scintilla of evidence," which "is insufficient to defeat a motion for summary judgment."  Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004).

---

[35]     In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Nevertheless, although "an employer's view is entitled to substantial weight," it is not determinative.  Holly, 492 F.3d at 1258.  The court also must examine:

> any written job description prepared before advertising or interviewing applicants for the job;[36] the amount of time spent on the job performing the function; the consequences of not requiring the employee to perform the function;…the work experiences of past employees in the job; and the current work experience of employees in similar jobs.

Samson v. Fed. Express Corp., 746 F. 3d 1196, 1201 (11th Cir. 2014); see also 29 C.F.R. § 1630.2(n)(3)(ii)-(vii).  Additionally, the EEOC instructs courts to consider whether:

> (1) the reason the position exists is to perform the function; (2) there are a limited number of employees available among whom the performance of the job function can be distributed; and (3) the function is highly specialized so that the incumbent in the position was hired for his or her expertise or ability to perform the particular function.

29 C.F.R. § 11630.2(n)(2).  Here, even an analysis of these factors demonstrates that the record contains no genuine dispute as to whether A-line preparation was an essential function of the Tech position.  First, as to the amount of time spent on the job performing the function, Leme did not dispute Pierce's testimony that Techs prepared A-lines on a daily basis.  See Pierce Aff. ¶ 5.  Indeed, Leme recognized that almost the entirety of his clinical training consisted of learning how to prepare A-lines by shadowing Techs and setting up fluid warmers.  See Leme Dep. at 117-18, 142-43, 164, 172-73.  Notably, Leme

---

[36]     Baptist has produced several written materials describing the Tech position.  The Court notes that the Job Summary is inapplicable because Baptist prepared it to advertise Leme's position.  See Leme Dep. at 113; Job Summary.  Further, the job description annexed to Carver's Affidavit is not helpful because, although Baptist hired Leme as an entry level Tech, the document describes an advanced Tech position.  See Carver Aff., Ex. 1: Technic II, Anesthesia; Carver Dep. at 38; Rosa Dep. at 26-27.  Accordingly, the only potentially relevant job description in the record is a skills checklist for the Tech position.  See Leme Dep., Ex. 20: Baptist Medical Center Competency Skills Checklist (Skills Checklist).  According to the Skills Checklist, Techs were evaluated based on how well they "[s]et up and calibrate[d] A-line[s]."  See Skills Checklist.  Although Baptist does not indicate the date on which it prepared the Skills Checklist, Leme testified that he had not seen it prior to his deposition.  See Leme Dep. at 141-42.  However, because the Court must draw all reasonable inferences in favor of the non-movant, the Court will assume that Baptist created the Skills Checklist after advertising Leme's position and interviewing applicants.  Therefore, the Court finds the "job description" factor of the essential functions test to be inapplicable.

testified that after Pierce trained him on A-line preparation, training "pretty much ended." Id. at 172-73.  Therefore, the Court finds that Techs spend a significant amount of time preparing A-lines, and also that the function is specialized and requires extensive training.

Additionally, with respect to past employees who held Leme's position, Crawford testified that while working for Baptist as a Tech, he prepared "a whole lot" of A-lines. See Crawford Dep. at 21.  He stated that A-line connection was a regular function of the Tech position, id. at 29, and that he "worked with [Leme] several times directly, doing A-lines," see Crawford Aff. ¶ 5.  Crawford indicated that he did not feel comfortable as a Tech until he mastered A-line preparation.  See Crawford Dep. at 23.  Further, Crawford testified that in his current position as a Tech at the Mayo Clinic, he connects and clears A-lines as a regular part of his duties.  Id.  at 10; Crawford Aff. ¶ 9.

As discussed, Carver created the Tech position in order "to provide the best assistance to enable the [a]nesthesiologists to perform their positions more efficiently, effectively and safely."  See Carver Aff. ¶ 2.  Indeed, a Tech's primary function was to "assist the anesthesiologist in any way necessary with surgical procedures" and provide "an extra set of hands, eyes and ears" so that the anesthesiologist could focus on the patient. See Pierce Aff. ¶ 3; Carver Aff. ¶ 2; Leme Dep. at 124, 140.  Dr. Velez confirmed that the most critical assistance Techs provide is with A-line preparation, and that if a Tech cannot fulfill this function, "they serve no purpose."  See Velez Aff. ¶ 4.  Although some anesthesiologists will complete the process if a Tech fails to prepare the A-line properly, see Pierce Dep. at 52-53; Crawford Aff. ¶ 8, this jeopardizes patient safety, as Techs are supposed to assist the anesthesiologists, who must "keep [their] attention focused on the patient and the tasks only the doctor can perform," see Fleming Aff. ¶ 3;

Carver Aff. ¶ 6.  This also puts patients at risk because the anesthesiologists remain completely sterile during the A-line preparation procedure, and rely on the Tech to touch unsterile items, which Leme does not dispute.  See Pierce Aff. ¶ 12; Leme Dep. at 145, 154.[37]  Accordingly, given Baptist's undisputed view that A-line preparation was an essential function of the Tech position, and the Court's analysis of the essential function factors, the Court finds that A-line preparation was an essential function of Leme's position.

The parties disagree as to whether reading patient information off the monitors was an essential function of the Tech position.  While Baptist contends that Techs must be able to convey information from the monitors to the anesthesiologists, especially during an emergency, see Pierce Aff. ¶11; Carver Aff. ¶ 10, Leme has produced evidence tending to show that reading monitors was a marginal part of his work as a Tech, see Leme Dep. at 158-59, 189.  However, the Court need not determine whether reading monitors was an essential function of the Tech position because there is no genuine dispute of material fact regarding Leme's inability to prepare A-lines, as discussed below, and on that basis alone, he is not a qualified individual under the ADA.

At the outset, the Court notes that there is no genuine dispute of material fact regarding Leme's inability to prepare A-lines without accommodation, as he must be able to do in order to prevail on his "regarded as" claim.  Indeed, Leme testified that although he had trouble connecting A-lines initially, he eventually found accommodations that he believed enabled him to prepare A-lines successfully.  Id. at 142, 144, 146, 165, 204. Leme indicated that in order to see air bubbles in the lines, he held the lines up to the

---

[37]      Leme testified that the Tech may touch the non-sterile cap of an A-line, see Leme Dep. at 145, but noted that the operating room is generally a sterile environment, id. at 154.

light.  Id. at 165.  Additionally, Leme explained that in order to connect the A-line to the catheter, he would feel the tips, id. at 145-46, and hold the line about two and a half feet away from his face, id. at 204.  Accordingly, because Leme admitted that he could not clear and connect A-lines, an essential function of his position as a Tech, without accommodation, to the extent Baptist seeks an entry of summary judgment on his "regarded as" claims, the Motion is due to be granted.

In order to determine whether Leme could prepare A-lines, even with accommodation, the Court must determine whether Leme's proposed accommodations were reasonable.  An accommodation is reasonable if "it enables the employee to perform the essential functions of the job."  Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1255 (11th Cir. 2001).  Leme's proposed accommodations include:  (1) having the anesthesiologists or nurses check his lines or clear the lines themselves, id. at 216, 227, 290; Notice at 2; (2) assigning Leme "to areas requiring fewer of the tasks that Baptist asserts he cannot perform," see Notice at 2; (3) allowing Leme to hold the line close to his face and up to the light, see Leme Dep. at 204-05; (4) permitting Leme to use his fingers to connect the A-line to the catheter, id. at 142-43, 146; (5) providing Leme with sterile gloves, see Notice at 2; and (4) giving Leme extra time to clear the lines, id.

Based upon the record undisputed evidence, the Court finds Leme's first and second proposed accommodations to be unreasonable as a matter of law.  Leme repeatedly testified during his deposition that in order to perform his job as a Tech, the anesthesiologist, nurse, or somebody else in the room should have prepared the A-lines.  See Leme Dep. at 216, 227, 290; Notice at 2.  In Leme's Notice, he proposed that Baptist accommodate him by assigning him to "areas requiring fewer of the tasks that Baptist

asserts he cannot perform," see Notice at 2, which in this instance is A-line preparation. However, as stated, an accommodation is only reasonable if it enables the employee to perform the essential functions of the job. Lucas, 257 F. 3d at 1259-60 (emphasis supplied). Although 42 U.S.C. § 12111(9)(B) indicates that an employer may be required to restructure a position, "job restructuring is required only where it is reasonable." Lucas, 257 F.3d at 1259. "The difference between the accommodation that is required and the transformation that is not is the difference between saddling a camel and removing its hump." Id. at 1260. An accommodation that simply eliminates, rather than enables the disabled employee to perform, an essential function of their job is "per se unreasonable." EEOC v. Eckerd Corp., No. 1:10-cv-2816-JEC, 2012 WL 2726766, at *6 (N.D. Ga. Jul. 9, 2012); see also Holly, 492 F.3d at 1256-57 (deeming an individual "not qualified" because his proposed accommodation eliminated an essential function, but did not enable him to perform it); Terrell v. USAir, 132 F.3d 621, 625-26 (11th Cir. 1998) ("[E]mployers are not required to create 'light-duty' positions for their disabled employees under the ADA."). In this vein, the "buddy system" is not a reasonable accommodation because "[a]n employer … is not required to reallocate essential functions." See Tetteh, 638 F. App'x at 987 (holding that "[e]ven if [the employer] could have assigned another [employee] to assist [the disabled plaintiff], the ADA does not require an employer 'to reallocate job duties in order to change the essential functions of a job.'") (citation omitted); Earl v. Mervyns, Inc., 207 F.3d 1361, 1367 (11th Cir. 2000) ("[a]n employer is not required by the ADA to reallocate job duties in order to change the essential functions of a job."); Holbrook v. City of Alpharetta, Ga., 112 F.3d 1522, 1528 (11th Cir. 1997) (same) (citation omitted); see also Williams v. Univ. of Michigan, No. 291323, 2010 WL 5129888, at *4 (Mich. Ct. App.

Dec. 16, 2010) (finding that that giving a Tech a "work buddy" to correct his mistakes is "not the same as plaintiff's being able to perform his own duties with the accommodation."). Neither reallocating the duty to prepare A-lines to the anesthesiologists and nurses, nor eliminating the duty from Leme's responsibilities altogether, would enable Leme to prepare A-lines himself. Therefore, these accommodations are per se unreasonable.

With respect to the remaining potential accommodations, the Court notes that "what is reasonable for each individual employer is a highly fact-specific inquiry that will vary depending on the circumstances and necessities of each employment situation." Holbrook, 112 F.3d at 1527. In a medical setting, the ability to ensure patient safety "is, inherently, a component of every essential function of the job." Collis v. Gwinnett Cnty., 156 F. Supp. 2d 1342, 1345 (N.D. Ga. 2001) (finding that the ability to react to emergency communications is inherently a component of every essential function of the job of a paramedic.). As discussed below, courts throughout the Eleventh Circuit have routinely deemed accommodations unreasonable where the accommodation did not enable employees in the medical field to perform the essential functions of their jobs and ensure patient safety.

For example, in U.S. Equal Emp't Opportunity Comm'n v. St. Joseph's Hosp., Inc., No. 8:13-cv-2723-T-30TGW, 2015 WL 685766, at **1, 8 (M.D. Fla. Feb. 18, 2015), the court held that a nurse's use of a cane in an in-patient psychiatric unit of a hospital was an unreasonable accommodation because it jeopardized her safety and the safety of the other patients and employees. The court explained that given the nurse's "age and size, she was a likely target in the event a patient wanted to use her cane as a weapon." Id.

at *7.  Due to staffing shortages, the hospital could not reduce this by risk by ensuring that she would be responsible only for one patient at a time.  Id.  Likewise, having the nurse lock up her cane in a secure room in the event of an emergency was not a reasonable accommodation because without her cane, the nurse's "ability to respond quickly and safely [wa]s severely compromised."  Id.  Ultimately, the court found the plaintiff's proposed accommodation unreasonable, and therefore, deemed plaintiff unqualified under the ADA, given the "particular realities of working within a psychiatric unit where the Hospital requires all nurses to be able to respond to any situation that may arise."  Id. at *8.

Likewise, in Collis, 156 F. Supp. 2d at 1349, the court held that hearing aids were an unreasonable accommodation for a paramedic with "a severe to profound (40%) loss of hearing in each ear."  Although the paramedic successfully completed the first phase of his training, in which he learned the basic job skills, his disability prevented him from completing the second portion of his training.  Id.  The court found that even with his hearing aid, the paramedic could not consistently react to emergency communications, which presented a direct threat to the health and safety of himself and others.  Id.

Similarly, in Gary v. Ga. Dep't of Human Res., No. 4:03-CV-164 (CDL), 2005 WL 6779781, at **2, 5 (M.D. Ga. Nov. 3, 2005), the court found that a registered nurse in a hospital's Adolescent Stabilization Transitional Unit was not a qualified individual under the ADA because her back injury prevented her from performing the essential functions of her job.[38]  There, the plaintiff's injury prevented her from standing or sitting for

---

[38]     The court decided this case under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. However, "[d]iscrimination claims under the Rehabilitation Act are governed by the same standards used in ADA cases," and "[c]ases decided under the Rehabilitation Act are precedent for cases under the ADA, and vice-versa."  Cash v. Smith, 231 F. 3d 1301, 1305 n.2 (11th Cir. 2000).

prolonged periods of time, pushing, pulling, bending, or lifting, and most importantly, from intervening during emergency situations. Id. at *2.  During emergencies, "she would wait behind a secured door or in the bathroom until other staff responded." Id. at *4.  In this regard, the court found that calling others to respond was not a reasonable accommodation because patient health and safety depended upon "the staff's ability to respond quickly to emergencies" and perform time-sensitive emergency measures, which "require[d] lifting, pushing, and/or pulling." Id.  Due to staffing shortages, it was essential for all nurses to be able to physically respond to an emergency. Id.  The court noted that although the plaintiff had been "lucky that no one was hurt due to her inability to respond to emergencies" in the past, her continued reliance on others to respond to emergencies for her was untenable, and ruled that she was not a qualified individual under the ADA. Id. at **4-5.

Courts in other circuits have found similar accommodations in the medical context unreasonable.  For example, in Stern v. St. Anthony's Health Ctr., 788 F.3d 276, 279 (7th Cir. 2015), the Seventh Circuit affirmed a district court's entry of summary judgment in favor of a hospital that terminated its chief psychologist whose memory deficiencies prevented him from performing the essential functions of his job.  In evaluating the reasonableness of the psychologist's proposed accommodations, the court noted that "[i]t is entirely proper … to consider the sensitive nature of the employee's position and the potential safety and liability risks involved." Id. at 295.  The court emphasized the risks to patient safety and noted that "[t]he ADA does not require an employer to walk on a razor's edge—in jeopardy of violating the [ADA] if it fired such an employee, yet in

_____

jeopardy of being deemed negligent if it retained him and he hurt someone." Id. at 295 (citation omitted).  Likewise, in Olsen v. Capital Region Med. Ctr., 713 F.3d 1149, 1150-51 (8th Cir. 2013), the Eighth Circuit affirmed a district court's entry of summary judgment in favor of the Capital Region Medical Center (CRMC) upon finding that the plaintiff's disability, epilepsy, prevented her from performing the essential functions of her job as a mammography technician.  The court found that the plaintiff's epileptic seizures "caused her to lose consciousness on multiple occasions" and posed an imminent "risk of injury to herself and the hospital's patients." Id. at 1153.  The essential functions of her job included "insuring patient safety," "operating sophisticated medical machinery and tending to the physical and emotional needs of the patient." Id. at 1154.  The court noted that "[e]ven with the CRMC's attempted accommodations, including reducing the brightness of lights, eliminating mold, and rerouting strongly perfumed patients to other technicians, [the plaintiff] still suffered from numerous seizures," and "[n]othing in the record establishe[d] [that she] could adequately perform th[ose] function[s] during the indefinite periods in which she was incapacitated." Id.

There is no genuine dispute of material fact in the instant action that Leme's proposed accommodations are unreasonable given the acute risks to patient safety. During his deposition, Leme testified that he believed he had been able to clear bubbles from A-lines by holding the lines up to the light. See Leme Dep. at 165.  However, Leme recognized that this accommodation was only feasible before he connected the line to the patient. Id. at 204-05.  Leme testified:

> If the cords are long, I could -- prior to connecting the A-line is when you would be checking for the bubbles, so yeah, I could hold the thing closer. I could hold it to the light to see the air bubbles, at which point I would have flushed -- flushed the lines prior to connecting it.

Id. (emphasis supplied).  Once the line was connected to the catheter inside the patient's artery and bandaged to the patient's wrist, Leme could not hold it up, see Pierce Aff. ¶ 8, because "grabbing" at the line and "moving it in and out" of the patients put them at risk of a hematoma and could have required re-starting the process, see Pierce Dep. at 21. Further, in a surgical setting, the time spent re-doing the process is critical, as for high risk patients, time delays "could be the difference between having a successful surgery and a poor outcome."  See Velez Aff. ¶ 5; Leme Dep. at 97-99 (acknowledging that he would not have time to use surgical loupes in the operating room).  Moreover, even if Baptist permitted Leme to hold the line up to the light in order to see the bubbles before the line was connected to the patient, there is no genuine dispute of material fact that this accommodation would not have enabled Leme to complete the remaining steps of A-line preparation.  Although Crawford testified that it is easier to see air bubbles once the line is attached to the patient because when blood is drawn "there is a higher contrast between blood and the clear bubbles," see Crawford Aff. ¶ 7, Leme testified that his disability makes it difficult to see all colors, regardless of the degree of contrast, see Leme Dep. at 246:4-246:19. Thus, once the line is inserted into the patient, Leme could neither see the air bubbles, despite the contrast, nor hold the line close to his eyes.  Accordingly, the Court finds this accommodation unreasonable because it would not enable him to complete the preparation of A-lines.

Leme also testified that he believed he could successfully connect an A-line because he used his fingers to connect the A-line to the catheter.  See Leme Dep. at 145-46.  Once the protective cap is removed, the sterile connector is exposed and cannot be contaminated.  See Pierce Dep. at 20; Leme Dep. at 145-46.  Although Leme testified

that he "[c]ould see the tips well enough to put them together without contaminating any part of the A-line," see Leme Dep. at 146, he later clarified that in order to see where to connect the A-line and the catheter, he had to hold the line about two and a half feet from his face, id. at 204.  As discussed, once the line is connected to the patient, the Tech cannot hold the line up without putting patient safety at risk.  Further, Pierce testified that on several occasions, he saw Leme touch sterile portions of the catheter with his non-sterile hands, thereby contaminating the lines.  See Pierce Dep. at 13-15; Pierce Aff. ¶¶ 14, 17.  Although Leme did not recall having any issues with Pierce, he did not deny that these incidents occurred, see Leme Dep. at 144-45.  As a Tech, Leme's fingers were not sterile because he touched non-sterile objects for the anesthesiologist.  See Pierce Aff. ¶ 14; Leme Dep. at 145.  Although Leme proposed that Baptist permit him to clean any lines "made unsterile by touching" with sterile wipes, see Notice at 2, Baptist presented testimony that while an infection, at times, can be warded off simply by wiping the contaminated tip with two alcohol swipes, see Carver Dep. at 47-48, if the anesthesiologist deems this insufficient, it may be necessary to re-do the entire line or administer medication, see Carver Aff. ¶ 8; Velez Aff. ¶ 5; Fleming Aff. ¶ 5; Pierce Aff. ¶ 8.  Indeed, Leme testified that an inability to clear and connect A-lines aseptically jeopardizes patient safety and can even cause death.  See Leme Dep. at 166.  Thus, the Court finds that the two accommodations that Leme believed enabled him to connect and clear A-lines successfully by the end of his training were unreasonable.

Crawford's testimony that he "worked with [Leme] several times directly, doing A-lines and other procedures," and that he "was satisfied that [Leme] had the ability to perform all necessary duties as a Baptist Anesthesia Technician," [sic], see Crawford Aff.

¶ 5, is insufficient to create a genuine dispute as to Leme's inability to prepare an A-line. For one, the testimony does not indicate whether Crawford or Leme cleared the A-lines when they worked together.  Additionally, Crawford's <u>general</u> assertion that Leme could perform "all necessary duties" does not address Baptist's <u>specific</u> contention that Leme could not prepare A-lines aseptically.  <u>See</u> <u>Liberty Leasing Co.</u>, 380 F.2d 1013 at 1016. Finally, "[a]n employee's performance is judged by the employer, not by that employee's peers." <u>Oliver v. TECO Energy, Inc.</u>, No. 8:12-cv-2117-T-33TBM, 2013 WL 6836421, at *6 n.7 (M.D. Fla. Dec. 26, 2013) (finding an employee unqualified under the ADA, despite a co-worker's testimony that the plaintiff was able to perform the essential functions of the job).  Accordingly, there is no genuine dispute of material fact that permitting Leme to use his hands to connect the A-line to the catheter would present an unreasonable risk to patient safety.

Additionally, the Court finds that there is no genuine dispute of material fact regarding Leme's remaining proposed accommodations.  Leme proposed that Baptist permit him to wear sterile gloves or grant him extra time to clear the lines.  <u>See</u> Notice at 2.  Pierce testified, and Leme did not dispute, that because the Techs must touch non-sterile equipment for the anesthesiologist, any pair of gloves worn would become contaminated, and subsequently, contaminate any line they touched.  <u>See</u> Pierce Aff. ¶ 14.  The only alternative would have been for Leme to have changed his gloves frequently, which would have been impractical in a surgical setting where "time is of the essence" and patient's lives were at risk. <u>Id.</u> at ¶ 15.  Patient safety depends on clearing lines efficiently and thoroughly.  <u>See</u> Pierce Aff. ¶ 8; Velez Aff. ¶ 5.  Indeed, Leme testified that he would not even use his prescribed loupes in the operating room because the

environment was too fast paced to put them on and remove them as needed.  See Leme Dep. at 97-99.  Accordingly, there is no dispute that permitting Leme to wear gloves or granting him extra time to connect and clear A-lines would not have been reasonable accommodations.

Ultimately, Leme has failed to produce evidence to create a genuine dispute of material fact regarding his ability to perform the essential functions of a Tech position without posing a direct threat to patient safety.  A qualified individual under the ADA "must be 'able to meet all of a program's requirements in spite of his handicap.'"  Sch. Bd. Of Nassau Cnty., Fla. v. Arline, 480 U.S. 273, 287 n.17, 107 S. Ct. 1123, 1131 n.17, 94 L. Ed. 3d 307 (1987) (quoting Southeastern Cmty. Coll. v. Davis, 442 U.S. 397, 406, 99 S. Ct. 2361, 2367, 60 L. Ed. 2d 980 (1979)).  Here, despite Leme's successful completion of phase I of his training, his inability to complete the second phase precludes him from proceeding under the ADA as a qualified individual.  See Jordan, 646 F. App'x at 737, 741 (affirming the district court's finding that plaintiff's anxiety prevented him from responding to potentially life-threatening situations, even though he completed the first part of his training without incident); Collis, 156 F. Supp. 2d at 1349 (finding that although the paramedic had completed the first portion of his training without incident, he was unqualified due to his failure to complete the second portion).  Several Baptist employees testified about errors Leme committed during A-line preparation, many of which Leme neither recalled nor denied.  See the Velez E-mail; Pierce Aff. ¶ 14, 17; Fleming Aff. ¶ 5-6; Carver Aff. ¶ 12; Leme Dep. at 144-45, 200-01, 211.  Leme also failed to dispute that an improperly prepared A-line jeopardizes patient safety, and can even cause death.  See Leme Dep. at 166:18-166:19; the Velez E-mail; Fleming Aff. ¶ 5; Pierce Aff. ¶ 8; Velez

Aff. ¶ 4; cf. Perez v. Sprint/United Mgmt. Co., No. 1:12-CV-3161-MHS, 2013 WL 6970898, at *6 (N.D. Ga. Dec. 19, 2013) (finding a genuine dispute of material fact regarding whether the plaintiff could perform the essential functions of his job in light of the fact that he had never been written up prior to his termination).   "Ultimately, [Leme] has not established a genuine dispute of material fact as to whether [ ]he could fulfill the essential functions of [the Tech position] with or without a reasonable accommodation … Without this showing, [ ]he is, by definition, not a qualified individual under the ADA."  Mason v. United Parcel Serv. Co., No. 16-10560, 2017 WL 83381, at *9 (11th Cir. Jan. 10, 2017). Accordingly, Summary Judgment is due to be entered in favor of Baptist as to all claims set forth in the Amended Complaint.

In light of the foregoing, it is

**ORDERED**:

1. Defendant's Objection to Portions of Tina Leme's Affidavit Filed by Plaintiff in Response to Defendant's Motion for Summary Judgment (Doc. 25) is **GRANTED** to the extent that Paragraph 8 of Tina Leme's Affidavit is excluded, and **DENIED** in all other respects.

2. Defendant's Motion for Summary Judgment and Memorandum of Law (Doc. 19) is **GRANTED.**

3. The Clerk of the Court is directed to enter **JUDGMENT** in favor of Defendant Southern Baptist Hospital of Florida, Inc. and against Plaintiff Kristiano Leme.

4. The Clerk of the Court is further directed to terminate all remaining pending motions and deadlines as moot and close the file.

**DONE AND ORDERED** at Jacksonville, Florida on March 29, 2017.

MARCIA MORALES HOWARD
United States District Judge

lc25
Copies to:
Counsel of Record

-51-